**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DISTRICT**

| | |
|---|---|
| **FEDERAL EXPRESS CORPORATION,** § | |
| **And FEDEX GROUND PACKAGE** § | |
| **SYSTEM, INC.,** § | |
| § | |
| **Plaintiffs,** § | |
| **v.** § | |
| § | **Civil Action No:** |
| **UNGER FABRIK, LLC,** § | |
| **JOHN YAMADA,** § | |
| **AJAY AGGARWAL, VIJAY** § | **JURY DEMAND** |
| **AGGARWAL, EZ MAILING** § | |
| **SERVICES, INC., and UNIVERSAL** § | |
| **DELIVERY SOLUTIONS, LLC.** § | |
| § | |
| **Defendants.** § | |

**COMPLAINT FOR DAMAGES**

## INTRODUCTION

Federal Express Corporation ("FedEx Express") and FedEx Ground Package System, Inc. ("FedEx Ground"), collectively the FedEx Parties, bring this suit as a result of a fraudulent reselling scheme involving Defendants Unger Fabrik, LLC ("Unger Fabrik"), John Yamada, EZ Mailing Services, Inc. ("EZ Mailing Services"), Universal Delivery Solutions, LLC ("UDS"), Ajay Aggarwal, and Vijay Aggarwal.  As pleaded below, this suit arises from Defendants' conspiracy to fraudulently induce the FedEx Parties to link unaffiliated business accounts in order for Defendants to gain access to highly discounted shipping rates that Defendants subsequently resold to third-parties for a profit.  The FedEx Parties bring claims for breach of contract, violation of the Racketeer Influenced and Corruption Act (RICO) (18 U.S.C. § 1961), fraud, conspiracy, and unjust enrichment.

1

**THE FEDEX PARTIES**

1.     FedEx Express is a Delaware corporation with its principal place of business located in Memphis, Tennessee.

2.     FedEx Ground is a Delaware corporation with its principal place of business located in Moon Township, Pennsylvania.  FedEx Ground maintains revenue collection and claims operations in Memphis, Tennessee.

**THE UNGER FABRIK DEFENDANTS**

3.     Defendant Unger Fabrik is a Delaware limited liability company with its principal place of business located in City of Industry, California.  Upon information and belief, Unger Fabrik is in the fashion apparel business.

4.     Defendant John Yamada was the Director of Human Resources and Director of Shipping/Transportation at Unger Fabrik from May 2006 through November 2018.  Defendant Yamada resides at 912 North Acacia Court, Unit F, Azusa, California, 91702.

**THE AGGARWAL DEFENDANTS**

5.     Defendant EZ Mailing Services is a New Jersey limited liability company with its principal place of business located in Elizabeth, New Jersey.

6.     Defendant UDS is a New Jersey limited liability company with its principal place of business located in Iselin, New Jersey.

7.     Defendant Ajay Aggarwal is the President of EZ Mailing Services, and upon information and belief, also maintains an ownership interest in UDS.  He resides at 21 Barbieri Court, Princeton, New Jersey, 08540.

8.     Defendant Vijay Aggarwal is the Vice President of EZ Mailing, and upon information and belief, also maintains an ownership interest in UDS.  He resides at 19 Supra Street, Princeton, New Jersey, 08540.

## JURISDICTION AND VENUE

9.     Subject matter jurisdiction is proper pursuant to 28 U.S.C. §1331 as this is a civil action that arises under federal law given Defendants' violations of the Racketeer Influenced and Corruption Act (RICO), 18 U.S.C. § 1961.

10.     Personal jurisdiction is proper as to Unger Fabrik because Unger Fabrik has had continuous and systematic contacts with Tennessee, has transacted business in Tennessee, and has made or performed contracts or promises substantially connected with Tennessee.

11.     Personal jurisdiction is proper as to all remaining Defendants pursuant to RICO's venue and jurisdictional provisions, 18 U.S.C. § 1965, in that each Defendant was a participant in a nationwide reselling scheme in violation of RICO.  Because jurisdiction over all defendants would not be proper in any other judicial district, this Court's exercise of jurisdiction over all Defendants meets the ends of justice in accordance with 18 U.S.C. § 1965.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the FedEx Parties' claims occurred within this district, and because this is the forum in which Defendants, particularly Unger Fabrik, transacted their affairs.  Specifically, the majority of the injuries to the FedEx Parties occurred in the Western District of Tennessee.  Defendants' reselling schemes utilized FedEx's computer systems, which are housed primarily in the Western District of Tennessee, the FedEx computer systems that allowed Defendants to open the shipping accounts are maintained in the

Western District of Tennessee, and the majority of FedEx Express' shipping network is routed through the Western District of Tennessee.

## FACTS

### A.      The Unger Fabrik Pricing Agreement

13.      In December of 2003, the FedEx Parties entered into a pricing agreement with Unger Fabrik (hereinafter, the "Pricing Agreement"), wherein the FedEx Parties agreed to provide shipping services to Unger Fabrik at highly discounted rates based on Unger Fabrik's shipping volume.

14.      The parties operated under the Pricing Agreement, as amended, until 2020, when it expired.[1]

15.      In the Pricing Agreement and all amendments thereto, Unger Fabrik agreed that the discounted rates were to be used exclusively for the benefit of Unger Fabrik's business.   The discounts were not to be used for the benefit of third parties absent FedEx's prior written consent.

16.      Specifically, paragraph 1 of the Pricing Agreement provides, in pertinent part, that the "***pricing provided to [Unger Fabrik] is for [Unger Fabrik's] exclusive use and benefit and may not be resold or otherwise extended to any other party without prior written consent of FedEx***."  (See Ex. A, Pricing Agreement, ¶1)(emphasis added.)

17.      "Reselling" occurs when an account holder agrees to ship a package on behalf of a third party or allows a third party to ship a package using the account holder's account, and charges that third party a shipping rate that is less than the market rate but more than the discounted rate. The third party thereby obtains a lower shipping rate than it could if it contracted directly with

---

[1] A true and correct copy of the Pricing Agreement and all subsequent amendments are attached hereto as collective Exhibit A.

FedEx, and the reseller retains the difference between the rate charged to the third party and the discounted rate.

18.     The Pricing Agreement also incorporated the terms and conditions of the FedEx Service Guide[2] (See Ex. A, ¶2), which likewise prohibited Unger Fabrik from the unauthorized use and/or resale of the discounts afforded to it under the Pricing Agreement.

19.     Specifically, the terms and conditions of the FedEx Service Guide provide, in pertinent part, as follows:

> Account numbers are issued by FedEx according to shipping location and are nontransferable.
>
> Any . . . rights or privileges that you acquire by holding a FedEx account number may not be used for any purpose other than shipping with FedEx and FedEx may seek damages against you for any improper, illegal or other misuse of your account.
>
> Improper, illegal or other misuse includes, but is not limited to, ordering supplies for any purpose other than shipping with FedEx, unauthorized consolidation of shipments owned by different parties, or violations of the terms and conditions in this FedEx Service Guide.
>
> Unauthorized use includes, but is not limited to, using the shipping discount of another FedEx account holder without the knowledge and permission of both FedEx and the account holder.
>
> Any individual or entity that uses the FedEx account or shipping discounts of another FedEx account holder without authorization will be charged Standard List Rates for all such shipments without prior notice.
>
> Use of your account number constitutes your agreement that all packages shipped by us shall be subject to these terms and conditions, as modified, amended, or supplemented.
>
> Any individual or entity that uses the FedEx account or shipping discounts of another FedEx account holder without authorization will be charged Standard List Rates for all such shipments without prior notice.

(Ex. B, FedEx Service Guide Terms and Conditions.)

---

[2] The relevant excerpts of the Terms and Conditions of the FedEx Service Guide and Tariff are attached here as collective Ex. B.

20.     The Terms and Conditions further state:

The party to whom a FedEx account number is issued is liable for all charges to the account, including those resulting from unauthorized use.  The account holder is responsible for the safekeeping of the account number.  The account number should be released only to those authorized to ship on the account.

(Ex. B.)

21.     Despite these contractual provisions, Defendants Yamada and Unger Fabrik fraudulently misused and/or resold the discounted pricing afforded under the Pricing Agreement to UDS, EZ Mailing Services, and/or the Aggarwal Defendants, who in turn, resold the discounts to third parties for a profit, all without FedEx's contractually required permission, and in violation of the Pricing Agreement.

**B.     The Fraudulent Linkage and Misuse of the Unger Fabrik Account**

22.     Between 2006 and 2018, Defendant John Yamada was FedEx's point of contact for the Unger Fabrik account.  During this period, Yamada also served as Unger Fabrik's Director of Human Resources, Director of Shipping/Transportation, and was a managing officer for the company.

23.     Yamada also executed several of the contractual amendments to the Pricing Agreement, and in doing so, represented to FedEx that he was fully and legally authorized to act on behalf of Unger Fabrik.  (Pricing Agreement, Ex. A.)

24.     Starting in 2012, Yamada, in his capacity as an officer of Unger Fabrik, began misusing the FedEx account by allowing United Business Freight Forwarders, LLC ("UBX"), a company unaffiliated with Unger Fabrik, to resell Unger Fabrik's discounted shipping rates to UBX's customers without FedEx's prior written consent.  (*See* Declaration of John Kokozos, ¶4, attached here as Ex. C.)

25.     UBX has always been legally independent from and unaffiliated with Unger Fabrik, and at all relevant times, Defendants Ajay and VJ Aggarwal (collectively, the "Aggarwals") owned UBX. (Kokozos Declaration, ¶5.)

26.     UBX was, however, affiliated with another entity, Defendant EZ Mailing Services, which was also principally owned by the Aggarwals.  (Kokozos Declaration, ¶4-5.)

27.     In exchange for allowing the misuse of the Unger Fabrik account by UBX, Defendant Yamada received cash and gift cards from UBX and/or the Aggarwals.  (Kokozos Declaration, ¶4.)

28.     Unger Fabrik also received a financial benefit from the misuse, as it received better discounted shipping rates as a result of the increased shipping volume that was generated, in part, due to the unauthorized shipments that were credited towards the Unger Fabrik account.  (Kokozos Declaration, ¶3.)

29.     In late 2015, UBX and EZ Mailing Services faced significant financial issues and were on the brink of bankruptcy.  Because the filing of bankruptcy petitions would disrupt and preclude any further account misuse by Yamada, Unger Fabrik, UBX, EZ Mailing, and the Aggarwals, Yamada, individually and in his capacity as an officer of Unger Fabrik, conspired with the Aggarwals to effectuate a new reselling scheme that involved the use of another FedEx account.

30.     Specifically, on November 4, 2015, an employee of UBX named John Kokozos, opened FedEx account #702572789 under the name of "Ascend & Evolve."  At the time the account was opened, "Ascend & Evolve" was the name of John Kokozos's personal business, a start-up company that was unaffiliated with Unger Fabrik or the fashion apparel industry. (Kokozos Declaration, ¶7.)

31.     Yamada was an acquaintance of Kokozos, and Yamada knew that Kokozos had opened the FedEx account in November 2015.  (Kokozos Declaration, ¶4.); (*See also,* Ex. D, Yamada Email.)

32.     When the Kokozos account was initially opened, shipments generated under the account, i.e., account number 702572789, did not receive any shipping discounts from FedEx.

33.     However, if the Kokozos account became affiliated and linked to another FedEx customer account that was authorized to ship with discounted pricing, like that belonging to Unger Fabrik, shipments generated under the Kokozos account would be entitled to the discounted shipping rates so long as the shipments were for the exclusive benefit of the customer and previously approved by FedEx in writing, facts which were known by Yamada and Unger Fabrik at all relevant times.

34.     With these facts in mind, Yamada, individually and in his capacity as an officer of Unger Fabrik, made several knowingly false verbal and written misrepresentations to FedEx that were aimed at inducing FedEx to link Unger Fabrik's account to that of Kokozos.

35.     Specifically, during the months after the Kokozos account was opened, Yamada, individually and in his capacity as an officer of Unger Fabrik, misrepresented to the FedEx sales manager on the Unger Fabrik account that Unger Fabrik would be "acquiring" the entity associated with the Kokozos account.

36.     Yamada made these communications verbally via telephone conversations with the FedEx sales manager.

37.     Yamada also made these representations in written correspondence to FedEx. Indeed, in an email dated December 15, 2015, just over a month after the opening of the Kokozos account, Yamada advised the FedEx account representative that Unger Fabrik would be acquiring

a company named "Higher Evolution Apparel," which was, according to Yamada, the new name of the apparel company that was affiliated with the Kokozos account.  Yamada sent this email from his Unger Fabrik email account, and signed the email in his capacity as "Vice President" for Unger Fabrik.[3]

38.     Yamada further directed FedEx to "link" the Kokozos account to the Unger Fabrik account, representing that the linkage was justified given Unger Fabrik's planned acquisition of the new apparel company.  (Ex. D, Yamada Email.)

39.     At the time he made these representations, Yamada was acting in his capacity as an officer of Unger Fabrik.

40.     At the time he made these representations, Yamada knew that they were false.

41.     Specifically, Yamada knew that Unger Fabrik did not have a legitimate business relationship or affiliation with any entity associated with the Kokozos account, including "Ascend & Evolve" and/or "Higher Evolution Apparel." He further knew that Unger Fabrik had never offered to purchase Ascend & Evolve, Higher Evolution Apparel, or any other entity associated with the Kokozos account, or otherwise suggested or communicated an intent to do so.  (Kokozos Declaration, ¶8.)

42.     He also knew that Unger Fabrik did not have any legitimate business dealings or relationship with John Kokozos.  Kokozos was not a client, employee, or vendor of Unger Fabrik, and was entirely unaffiliated with Unger Fabrik from a business standpoint. (Kokozos Declaration, ¶8.)

---

[3] A true and correct copy of the December 2015 email is attached here as Ex. D.

43.     Given Yamada's position with Unger Fabrik and the parties' prior business relationship, FedEx justifiably relied on Yamada's misrepresentations concerning Unger Fabrik's plan to acquire the business associated with the Kokozos account.

44.     In January of 2016, per Yamada's request, FedEx linked the Kokozos account to that of Unger Fabrik, which in turn allowed the Kokozos account to receive the same highly discounted shipping rates that Unger Fabrik received.

45.     When it agreed to link the two accounts, FedEx did so with the justifiable belief that the accounts were affiliated and that shipments generated through the Kokozos account would be in furtherance of and for the exclusive benefit of Unger Fabrik's business.

46.     FedEx never gave Unger Fabrik the contractually required written consent to resell or extend to unaffiliated third parties the shipping discounts that it received from the FedEx Parties under the Pricing Agreement.

47.     FedEx also never gave Unger Fabrik written permission to use the discounted rates for shipments that were not connected to or affiliated with Unger Fabrik's business.

48.     However, once the accounts were linked, Yamada, again in his capacity as an officer for Unger, continued to allow unaffiliated businesses and individuals to access and use the discounted pricing in exchange for individual cash payments and the desire to obtain further discounted pricing for Unger Fabrik based on the volume of shipments that were credited towards the Unger Fabrik account.

**C.      The Reselling Scheme**

49.     Following the fraudulent linkage of the accounts in 2016, UBX and EZ Mailing Services filed for bankruptcy.

50.     The Aggarwal brothers subsequently formed a new entity, Defendant UDS, and hired Kokozos as UDS's senior vice president of sales.  (Kokozos Declaration, ¶9.)

51.     Like UBX, UDS has never been an affiliate of Unger Fabrik, and FedEx has never provided Unger Fabrik with the contractually required written permission to allow UDS to use the exclusive discounts afforded under the Pricing Agreement.

52.     Despite this, Yamada and Unger Fabrik again misused the account by allowing UDS and the Aggarwals to regain access to the discounted pricing through the Kokozos account. (Kokozos Declaration, ¶9.)

53.     Likewise, following the dismissal of EZ Mailing Services' bankruptcy proceeding, Uber Fabrik also allowed EZ Mailing Services to continue its improper use of the discounted pricing, again without FedEx's prior consent.  (Kokozos Declaration, ¶9-10.)

54.     Once the Aggarwal Parties gained access to the shipping discounts belonging to Unger Fabrik, they would arrange for their customers to tender a shipment to one of the FedEx Parties for transportation, using the customer's own FedEx shipping number.  The Aggarwal Parties would sometimes have access to the user-names and passwords for these customers' FedEx accounts.  In these instances, the Aggarwal Parties would access their customers' FedEx accounts, and when creating shipping labels for each relevant shipment, direct FedEx to bill the Kokozos account for the relevant shipments.  (Kokozos Declaration, ¶9-10.)

55.     Alternatively, the Aggarwal Parties would direct their customers to bill the shipments directly to the Kokozos account, again without the permission or consent of FedEx.

56.     The Aggarwal Parties would then send an invoice, either electronically via email or through the mail, to their customers for the shipments with an average markup of ten to fifteen

percent over the discounted shipping rates provided for under the Pricing Agreement.  (Kokozos Declaration, ¶9-10.)

57.     By using the discounts belonging to Unger Fabrik, the customers of the Aggarwal Parties would receive a much higher shipping discount than they would have otherwise received for the shipment.

58.     Between 2017 and 2019, Defendants resold and/or misused the exclusive pricing discounts afforded under the Pricing Agreement on at least 41,358 different occasions, resulting in over $1.7 million in losses to the FedEx Parties.

## COUNT I (as to all Defendants)
### (VIOLATIONS OF RICO 18 U.S.C. § 1962(c))

59.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

60.     Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

61.     Defendants John Yamada, Vijay Aggarwal, Ajay Aggarwal, Unger Fabrik, UDS, and EZ Mailing Services, are each "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1964(c).

62.     Defendants Unger Fabrik, UDS, and EZ Mailing Services, are each "enterprises" within the meaning of 18 U.S.C. 1961(4) and 18 U.S.C. § 1964(c).

63.     Defendants John Yamada, Vijay Aggarwal, and Ajay Aggarwal were each employed by or associated with an enterprise, that is, Unger Fabrik, UDS, and/or EZ Mailing Services, or Defendants formed an association in fact.

64.     At all relevant times, Defendants were engaged in and their activities affected interstate commerce, in that they, among other conduct, fraudulently induced the FedEx Parties to ship thousands of packages across the country at highly discounted prices, resold wrongfully obtained discounted shipping rates to customers across the country for a profit, invoiced customers across the country for the wrongfully obtained discounted shipping rates, and communicated with one another, both verbally and in writing, while in various states across the country, all in furtherance of their scheme.

65.     During the relevant times, and in furtherance of and for the purpose of executing the scheme to defraud the FedEx Parties, Defendants on numerous occasions, used and caused to be used the mail, wires, and devices, in interstate and foreign commerce, in violation of 18 U.S.C. § 1341, (mail fraud), § 1343 (wire fraud), and § 1029 (device fraud).

66.     Specifically, with the intent to defraud FedEx into linking the unaffiliated accounts, Defendants Unger Fabrik and Yamada transmitted in interstate commerce, via telephone calls and emails, communications and knowingly false misrepresentations concerning Unger Fabrik's intent to acquire the entity associated with the Kokozos account.

67.     Likewise, in furtherance of the scheme, the Aggarwals, UDS, and/or EZ Mailing transmitted, both electronically and via the mail, the marked up invoices to their customers for purposes of profiting from the scheme.

68.     Moreover, on over 40,000 occasions, Defendants electronically rebilled shipments to the Kokozos account, and in so doing fraudulently induced FedEx to ship thousands of packages to locations across the country at drastically discounted pricing.

69.     In carrying out the fraudulent scheme as described above, Defendants have engaged in "racketeering activity" for purposes of RICO, which is defined as "any act which is indictable under any of the following provisions of Title 18, United States Code §1029 (relating to access device fraud), §1341 (relating to mail fraud), and §1343 (relating to wire fraud)."

70.     The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to or pose a threat of continued racketeering activity, and therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

71.     As a proximate result of Defendants' unlawful pattern of illegal conduct as described above, Plaintiffs have been injured in their property by loss of payments due, as described above.

## COUNT II (as to all Defendants)
## (VIOLATIONS OF RICO 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c))

72.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

73.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

74.     Plaintiffs incorporate, as though fully set forth herein, their allegations about enterprise.

75.    Defendants have violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of affairs of the previously described § 1962(c) enterprises through a pattern of racketeering activity.

76.    As demonstrated in detail above, co-conspirator Defendants have engaged in numerous predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions regarding the obtaining and the use of the Kokozos account, as well as the use of the wires and mail to perpetuate the scheme.

77.    Defendants' pattern of fraudulent racketeering activities also includes systematic and repeated fraudulent use of an access device, to wit, the FedEx account number assigned to Unger Fabrik.

78.    The above-described nature of co-conspirator Defendants' acts and material misrepresentations in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962 violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are a part of an overall pattern of racketeering activity.

79.    As a direct and proximate result of Defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and continue to be injured in their business or property as set forth more fully above. Pursuant to 18 U.S.C. § 1964(c) of RICO, Plaintiffs are entitled, therefore, to bring this action and to damages, treble damages, costs of bringing this suit, attorneys' fees, and such other relief that this Court deems proper.

## COUNT III: BREACH OF CONTRACT (as to Unger Fabrik)

80.     The FedEx Parties re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

81.     The Pricing Agreement, along with the incorporated Terms and Conditions of FedEx Service Guide, constitute an enforceable contract between the FedEx Parties and Unger Fabrik.

82.     Under the terms of the Pricing Agreement, Unger Fabrik had a contractual duty to use the shipping discounts provided thereunder for its exclusive benefit and use.

83.     The Pricing Agreement also precluded Unger Fabrik from reselling or extending the discounted shipping rates to third parties absent FedEx's prior written consent.

84.     Despite these contractual provisions, Unger Fabrik repeatedly misused and/or resold the discounted pricing to third parties without FedEx's contractually required permission, all in violation of the parties' contract.

85.     By repeatedly reselling the discounted shipping rates to third parties and allowing the discounted shipping rates to be resold to third parties, Unger Fabrik breached the parties' contract.

86.     As a result of this breach, the FedEx Parties sustained significant damages because they lost the revenue to which they would have otherwise been entitled if the third parties had shipped directly with the FedEx Parties at market rates.

87.     Specifically, between 2017 and 2019, FedEx Express was damaged by this breach in the amount of $1,571,815.47.

88.     FedEx Ground was damaged by this breach in the amount of $157,440.56 during this period.

## COUNT IV: UNJUST ENRICHMENT
### (As to Defendants UDS, the Aggarwals, and EZ Mailing Services)

89.     The FedEx Parties re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

90.     The FedEx Parties conferred a benefit to Defendants Ajay Aggarwal, Vijay Aggarwal, EZ Mailing Services, and Universal Delivery Solutions when Defendants third-party billed shipments to the Kokozos account, and thereby received the shipping discount of Unger Fabrik.

91.     Defendants appreciated the benefit and used it to make shipments that were not for the benefit of Unger Fabrik but were solely for the unauthorized benefit and gain of Defendants Ajay Aggarwal, Vijay Aggarwal, EZ Mailing Services, and Universal Delivery Solutions.

92.     As a direct and proximate result of Defendants Ajay Aggarwal, Vijay Aggarwal, EZ Mailing Services, and Universal Delivery Solutions' unlawful and improper conduct, Defendants Ajay Aggarwal, Vijay Aggarwal, EZ Mailing Services, and Universal Delivery Solutions unjustly appreciated a benefit, in that they profited from their resale of greatly discounted shipping rates to which they were not entitled.

93.     It would be inequitable for Defendants Ajay Aggarwal, Vijay Aggarwal, EZ Mailing Services, and Universal Delivery Solutions to retain the ill-gotten benefit of the greatly discounted shipping rates, because the rates were enjoyed without the authorization of the FedEx Parties.

94.     The amount of damages suffered by FedEx Express and FedEx Ground, that is, the unjust enrichment enjoyed by Defendants, shall be proven at trial.  The FedEx Parties are entitled to an award of its costs, as well as imposition of a constructive trust over Defendants' ill-gotten gains.

## COUNT V:  FRAUD (as to all Defendants)

95.     The FedEx Parties re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

96.     Defendant Yamada and Unger Fabrik made a knowingly false misrepresentation to FedEx when Yamada advised FedEx that Unger Fabrik would be acquiring the entity associated with the Kokozos account.

97.     At the time he made this communication, Yamada knew that Unger Fabrik had no plans to acquire the entity associated with the Kokozos account.   Rather, he made this misrepresentation in an effort to induce FedEx to link the two unaffiliated accounts so that Defendants could continue their reselling scheme.   FedEx did so, justifiably, given its prior relationship with Unger and Yamada's status as a Vice President for the company.

98.     Moreover, every time the Aggarwal Parties "third-party billed" a shipment from their customers' account to the Kokozos account, they made a misrepresentation of a material fact to FedEx, in that the Aggarwal Parties falsely represented that they had authority to use the Kokozos account to which they billed the charges.

99.     When Defendants made these representations to FedEx, they knew that they were false.  Defendants did not have the permission of FedEx to use these heavily-discounted shipping rates provided by FedEx to Unger Fabrik.

100.    Every time the Aggarwal Defendants made payments on these accounts belonging to other FedEx customers, their action to pay on the account amounted to a false representation that the Defendants had authority to third-party bill shipments to the Kokozos account.  By making these greatly-reduced payments, the Aggarwal Defendants were able to perpetuate their fraud.

101.     As a result of Defendants' misrepresentations, FedEx suffered injuries, including but not limited to lost revenue and other damages from 2017 to 2019, in that, between 2017 and 2019, FedEx Express lost $1,571,815.47 in revenue, and FedEx Ground lost $157,440.56 in revenue.

### COUNT VI:  CIVIL CONSPIRACY (as to all Defendants)

102.     The FedEx Parties re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

103.     Defendants Yamada, Unger Fabrik, the Aggarwals, EZ Mailing Services, and Universal Delivery Solutions conspired together and devised a common design to defraud the FedEx Parties out of their rightful revenues.

104.     The common design by Defendants was to accomplish the unlawful purpose of using the shipping discount rates of Unger Fabrik, a discount to which the Defendants were not entitled to use.

105.     Defendants' overt acts in furtherance of this conspiracy consisted of:

(1)     Inducing the FedEx Parties to link the shipping discounts belonging to Unger Fabrik to the Kokozos account, i.e., account number 702572789, by making knowingly false misrepresentations regarding Unger Fabrik's plan to acquire the entity associated with the Kokozos account;

(2)     In exchange for cash, cash equivalent benefits and other valuable consideration, allowing the Aggarwal Parties access to the shipping discounts of the Kokozos account;

(3)     Allowing the customers of the Aggarwal Parties to third-party bill shipments that did not belong to Unger Fabrik to the heavily discounted accounts of the Kokozos account; and

(4)     Making payments on the usurped accounts to perpetuate the scheme.

106.    As a result, the FedEx Parties suffered injuries in the form of lost revenue in an amount in excess of $1,700,000.

## PRAYER FOR RELIEF

WHEREFORE, FedEx Express and FedEx Ground demand a trial by jury of all issues and prays for judgment against Defendants as follows:

(A)    For Counts I and II (RICO Violations as to all Defendants), an amount to be proven at trial, but an award of not less than $1.7 Million Dollars, the sum of which shall be trebled in accordance with § 1964 (c) of RICO, as well as the costs of suit and attorneys' fees as allowed under RICO.

(B)    For Count III (Breach of Contract as to Unger) and Count IV (Unjust Enrichment as to EZ Mailing Services, UDS, and the Aggarwals), a damages award to be proven at trial amounting to no less than $1.7 Million Dollars, as well as punitive damages, the costs of suit, and attorneys' fees;

(C)    For Counts V (Fraud as to all Defendants) and VI (Civil Conspiracy), an award of damages to be determined at trial amounting to no less than $1.7 Million Dollars, as well as punitive damages.

(D)    For such other damages, relief, pre- and post-judgment interest, disgorgement of any monetary benefit obtained by Defendants as a result of the above schemes, and additional relief as the Court deems just and appropriate.

Dated:  March 19, 2021                          Respectfully submitted,

                                                *s/ Thomas W. Murrey, Jr.*
                                                Thomas W. Murrey, Jr.
                                                FEDERAL EXPRESS CORPORATION
                                                Tennessee Bar #011623
                                                3620 Hacks Cross Road
                                                Building B – 3rd Floor
                                                Memphis, Tennessee 38125
                                                Telephone:     (901) 434-8558
                                                Facsimile:      (901) 434-9279
                                                Email: twmurrey@fedex.com

                                                *s/ Michael C. McLaren*
                                                Michael C. McLaren
                                                FEDERAL EXPRESS CORPORATION
                                                Tennessee Bar # 28277
                                                3620 Hacks Cross Road
                                                Building B – 3rd Floor
                                                Memphis, Tennessee 38125
                                                Telephone:     (901) 434-3000
                                                Facsimile:      (901) 434-9279
                                                Email: Michael.mclaren@fedex.com

                                                s/ *William G. Whitman*
                                                William G. Whitman (#23376)
                                                FEDEX GROUND PACKAGE SYSTEM, INC.
                                                1000 FedEx Drive
                                                Moon Township, PA 15108
                                                Telephone: (412) 262-7327
                                                Email: William.whitman@fedex.com